**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **AHMED ABRAHEM AHMED GADALLA,**<br><br>Plaintiff,<br><br>v.<br><br>**THESENTRYORG INC. d/b/a THE SENTRY,**<br>1629 K Street, NW, Suite 300<br>Washington, DC 20006<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. ________________<br>JURY TRIAL DEMANDED |

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Ahmed Abrahem Ahmed Gadalla, by and through his undersigned counsel, brings this Complaint against Defendant TheSentryOrg Inc. d/b/a The Sentry and alleges as follows:

**INTRODUCTION**

1. The Sentry, an advocacy organization co-founded by George Clooney and John Prendergast, publishes investigations for the purpose of persuading governments to impose sanctions on the people it names. In April 2026, it named Ahmed Gadalla. It falsely told the world that Mr. Gadalla bankrolled a warlord's assault on his own country's capital with stolen public money, that he paid Russia's Wagner Group mercenaries, that he secretly controls three Libyan banks and uses them to commit fraud and launder money, that he oversaw the printing of counterfeit currency in Russia, and that he smuggles combat drones and military hardware in violation of a United Nations arms embargo. It called on four governments, the European Union, and the United Nations Security Council to sanction him; on the United Arab Emirates to order its

companies to cut him off; on the world's banks to flag him; and on Libyan prosecutors to charge him. The Sentry's entire narrative was false.

2. The Sentry published its false and defamatory allegations twice. On or about April 6, 2026, it published a twenty-five-page report titled *Eastern Libya's Top Money Man: Spotlight on Ahmed Gadalla* (the "Report"). (Exhibit 1.) And, within a day, it published a press release titled *'Eastern Libya's Money Man': New Investigation Exposes the Haftar Family's Top Fixer* (the "Press Release") (Exhibit 2) and distributed it to journalists through its Director of Communications.

3. The Sentry's false attack on Mr. Gadalla begins with a single alleged transaction, and everything else it says about him is built on top of that transaction. The story The Sentry tells is that in the months before Field Marshal Khalifa Haftar's April 2019 assault on Tripoli, Mr. Gadalla used a set of Emirati companies to borrow $300 million from the Abu Dhabi bank al-Masraf, secured by a guarantee deposit of Libyan public money from the Libyan Foreign Bank ("LFB"), and funneled the proceeds into the war. But it never happened.

4. That false accusation is the foundation of the entire narrative The Sentry advances. It is how, in The Sentry's telling, a Benghazi trader became indispensable to the Haftar family. And being indispensable to the Haftar family is, in The Sentry's telling, how Mr. Gadalla then obtained covert control of Libyan banks, how he came to oversee a Russian counterfeit-currency scheme, how he was positioned to commit "large-scale letter-of-credit fraud," and how he became the family's "fixer for money and arms."

5. The Report's narrative opens with the 2019 transaction and three of its sections are devoted to it: "Toward Conflict: A Plan, a Bank, and a Financier," "How Libyan Money Funded Haftar's Failed Offensive on Tripoli," and "Haftar's forces receive $300 million via the UAE."

The Press Release focuses on it as well, telling journalists that Mr. Gadalla's involvement "traces back" to his "first pro-Haftar scheme" in which he "used utilized [sic] Emirati companies to borrow $300 million from Abu Dhabi's al-Masraf bank, backed by a guarantee deposit from the Libyan Foreign Bank—public money from Tripoli—to help finance Haftar's April 2019 offensive on Tripoli."

6. It is all false. Al-Masraf, the lending bank at the center of the story, has certified in writing that Mr. Gadalla's company "has no liabilities toward Al Masraf." (Exhibit 3.) The Libyan Foreign Bank's own confidential investigation into that very guarantee arrangement—a twenty-two-page report signed in January 2024, more than two years before The Sentry published—found that the guarantee documents were signed by the LFB's own former acting General Manager, identified the three companies whose obligations they purported to secure, and recommended that the former General Manager and the 2019 board be referred for criminal investigation. Mr. Gadalla is not one of those companies, is not the signatory for, nor beneficial owner of those companies, and is not mentioned anywhere in the twenty-two pages. (Exhibit 4.)

7. An independent professional examination of the bank's books shows the same thing. In August 2025, eight months before publication, a Big Four accounting firm completed a due-diligence review of al-Masraf's entire credit portfolio for a prospective third-party acquirer, working from the bank's own credit files. (Exhibit 5.) That review identifies the borrowers associated with the $300 million Libyan Foreign Bank guarantee as two related Libyan entities—not Mr. Gadalla nor any company connected to him. And neither Mr. Gadalla, nor Alushibe Holding Group, nor Al-Mored Oasis General Trading LLC, nor any affiliated entity appears anywhere in that portfolio as a borrower.

8. The Sentry did not merely publish the accusation. It demanded that Mr. Gadalla be prosecuted for it, urging Libyan authorities to refer "evidence pertaining to 2019's $300 million payments and related offenses involving Gadalla to the Attorney General's Office for prosecution." It told its readers that an inquiry was already underway. It sourced that assertion to its own interviews with "a Libyan official close to the Attorney General's Office." And it never put a single question to the Attorney General's Office itself.

9. Mr. Gadalla did. The Investigation Unit of the Office of the Attorney General of Libya searched the very file The Sentry had invoked—the investigation opened on the Libyan Foreign Bank's report concerning the al-Masraf guarantee document—and on April 15, 2026, certified that Mr. Gadalla's name does not appear in that guarantee document; that it has not been established, upon examination and verification, that Mr. Gadalla or any entity dealing with him obtained any financing or loan from al-Masraf; and that no record exists in the Office's registers or electronic system indicating that Mr. Gadalla or his company obtained any guarantee issued by the Libyan Foreign Bank. (Exhibit 6.)

*Original*



*Certified translation*



2. The name of the aforementioned individual does not appear in the guarantee document subject of the report; likewise, neither the name of **Almored Oasis General Trading LLC.** nor any of the aforementioned entities appears in the particulars of the said document.
3. It has not been established, upon examination and verification, that the aforementioned individual or the entities dealing with him have obtained any financing or loan from the **Arab Bank for Investment and Foreign Trade (Almasrif Bank)**.
4. No records exist in the Office's registers or electronic system indicating that the aforementioned individual or the concerned company has obtained any guarantee issued by the Libyan Foreign Bank.

*Exhibit 6: Certificate of the Office of the Attorney General of Libya, No. 7947-6-6 (Apr. 15, 2026), with findings 2 through 4 enlarged.*

10. The Libyan Office of the Attorney General—the very authority The Sentry summoned to prosecute Ahmed Gadalla—is the authority that says there is nothing to prosecute.

11. The Sentry also knew where that inquiry was actually pointed. In a single clause buried twelve pages deep in the Report, The Sentry mentions "the Libyan Attorney General's inquiry, which seems to focus on former LFB general manager Jamal, remains ongoing." Jamal is Mohammed Najib Hamida Al-Jamal, the former acting General Manager of the Libyan Foreign Bank—the same man the Libyan Foreign Bank's own investigators identified as the person who actually signed the guarantee documents, and the same man they recommended be referred for criminal prosecution. The Sentry knew, and told its readers in passing, that the Libyan prosecutors were looking at someone other than Mr. Gadalla.

12. That information was critical. Yet The Sentry put it where almost no one would read it. It does not appear in the Report's title, which is *Spotlight on Ahmed Gadalla*. It does not appear in the Report's Executive Summary, which tells readers that Mr. Gadalla "utilized a set of companies based in the United Arab Emirates" to secure the loans and that the funds "were funneled by Gadalla's companies into the war effort." It does not appear in any of the Report's section headings, which announce "How Libyan Money Funded Haftar's Failed Offensive on Tripoli" and "Gadalla Now: The Haftars' Fixer for Money and Arms." It does not appear in the Report's Recommendations, which urge that evidence "involving Gadalla" be referred to that same Attorney General's Office for prosecution. And it does not appear anywhere in the Press Release, which tells journalists without qualification that Mr. Gadalla borrowed the money and that the loans "were never fully repaid, leaving the Libyan public holding the bill for an attack on their own capital."

13. The foundation for The Sentry's narrative is false. And on that false foundation, The Sentry built the rest of its story. Most of the remaining accusations are independently refuted by the records of the very institutions The Sentry wrote about. The Central Bank of Libya certifies that no blacklist circular has ever been issued against Gadalla's companies and that there are no suspicious-transaction reports concerning him. (Exhibit 7.) The official Libyan Stock Market registry records show that he holds 2.5% of Wahda Bank—the bank The Sentry says Mr. Gadalla controls—and no shares whatsoever of National Commercial Bank, which certifies that it has never had any relationship with him. (Exhibits 14, 15, 17.) Wahda Bank's General Manager certifies that every letter of credit involving his companies was executed lawfully. (Exhibit 9.) The Dubai commercial registry records that UDS Shipping Services LLC, the company whose vessel anchors every arms-trafficking accusation, is and always has been wholly owned by another

man. (Exhibit 10.) And Lloyd's List Intelligence, the maritime database on whose entry The Sentry rested that accusation, had formally removed the entry before the Report was published. (Exhibit 12.)

14. None of this had to happen. The proof was not hidden, and almost none of it was new. Al-Masraf's certification, the Libyan Foreign Bank's own January 2024 investigation, the August 2025 review of the bank's entire loan book, the Central Bank's records, the national share registry, the Dubai commercial registry, and Lloyd's List Intelligence's own correction all existed before The Sentry published a word. The Attorney General's Office was reachable, and it answered as soon as it was finally asked.

15. Mr. Gadalla was reachable too, and he was ready to answer. By The Sentry's own account, its entire pre-publication outreach to him consisted of two emails sent in late February 2026 that drew no reply. No telephone call. No letter. No approach through his companies, their published telephone numbers, or their officers.

16. Yet days before publication, a reporter for Canada's *Globe and Mail* reached Mr. Gadalla at one of those very addresses and had his answer in fifty minutes. It was from her, and not from The Sentry, that Mr. Gadalla learned these accusations were being made against him at all. He told her he had never received anything from The Sentry and asked to be given the allegations, and the report describing them, so that he could respond. She replied that her understanding was that The Sentry had already provided him the details, and that she would "contact them and ask them to provide you with a copy of their report." (Exhibit 13.) On information and belief, she did.

17. Had The Sentry told Mr. Gadalla what it intended to publish and what it was resting on, this case might not exist. He did not need weeks to investigate his own affairs. He needed

only to be told what the accusations were, and he could have put in The Sentry's hands the lending bank's certification that his company owes it nothing, the Libyan Foreign Bank's own investigation naming the man who actually signed the guarantee documents, the Dubai registry recording UDS Shipping's actual owner, and the correction Lloyd's List Intelligence had already made to the database entry on which the entire arms-trafficking accusation rested. Mr. Gadalla could have also requested and provided the certification from the Attorney General's office. The Sentry never gave him that chance.

18. There was no reason for the haste. Nothing about either publication was time sensitive. The transaction at the center of the story was seven years old. The Sentry's own endnotes reflect source interviews dating to 2022. What the Report asked of its readers—targeted sanctions, severed banking relationships, criminal prosecution—were policy demands, not perishable news. The Sentry took years to build its accusations and would not give Mr. Gadalla days to answer them.

19. Behind the scenes, The Sentry had already cast Mr. Gadalla as the lead bad actor in a story about Haftar family finance, and a documented answer from him was of no use to a publication whose measure of success is a government designation—in effect, a government-issued bar to banking and commerce. The Sentry did not send him the Report, did not renew its outreach, and did not wait a single day.

20. The Report is bad enough and actionable by itself. It carries 400 endnotes that create the appearance of documentation, but roughly a third of them are The Sentry citing itself or citing an unnamed person it says it interviewed. Those are the citations attached to the gravest accusations against Mr. Gadalla: the $300 million, the control of the banks, the counterfeit currency, and the ownership of the ship.

21. The Press Release is worse. It is a separate publication, roughly a thousand words, posted the next day and distributed to journalists by The Sentry's Director of Communications. It carries every one of the accusations set out above, but with no endnotes, no citations, no attribution to any source, and no qualification of any kind. Where the Report attempted to hedge its gravest factual accusations and attributed them to unnamed sources, the Press Release restates them as flat, established fact—the findings of an "investigation" that "exposes."

22. After publication, Mr. Gadalla did what The Sentry had never given him the chance to do. Within a week, through counsel, he delivered the records, and he supplemented them over the following weeks with the Attorney General's certification and with the accounting firm's review of al-Masraf's loan book. The Sentry refused to retract. It announced that it "remains confident in the accuracy of its reporting," and it dismissed the official records *en masse*—including the certification of the very Attorney General's Office whose authority its Report had invoked—on the ground that records from Libyan institutions in eastern Libya are unworthy of credit.

23. The consequences were the ones The Sentry intended. Many banks, compliance departments, counterparties, and regulators treat a published sanctions-advocacy report naming an individual as a disqualifying red flag. Mr. Gadalla has lost transactions and relationships, his banking access has been impaired, and the livelihoods of thousands of employees are threatened merely because they work for companies run by Mr. Gadalla.

24. Mr. Gadalla brings this action to clear his name, to hold The Sentry accountable for the harm it has inflicted, and to establish before a jury what the documentary record already shows: The Sentry's accusations are false.

## PARTIES

25. Plaintiff Ahmed Abrahem Ahmed Gadalla, also known as Ahmed Alushibe and rendered in certain Libyan corporate records as "Ahmed Ibrahim Ahmed Jadallah" ("Mr. Gadalla"), is a citizen of Libya, St. Kitts and Nevis, and the UAE. He is a lawful permanent resident of Canada, where he has resided with his family since 2022. He is the founder and Chairman of Alushibe Holding Group, a privately held group of companies. He is not a citizen or resident of the United States.

26. Defendant TheSentryOrg Inc., which does business as "The Sentry" and is also known in certain records as "THESENTRY ORG INC" and "NOT ON OUR WATCH INC" ("The Sentry"), is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Washington, D.C. The Sentry was co-founded by George Clooney and John Prendergast. On information and belief, The Sentry wrote, edited, published, and distributed both the Report and the Press Release from and in the District of Columbia, and directs its publications and its advocacy at policymakers in Washington, D.C.

## JURISDICTION AND VENUE

27. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because this is a civil action between a citizen or subject of a foreign state and a citizen of a State, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

28. This Court has personal jurisdiction over The Sentry because it maintains its principal place of business in the District of Columbia and is at home in this District.

29. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because The Sentry resides in this District and because a substantial part of the events giving rise to these claims occurred here.

## FACTUAL ALLEGATIONS

### A. Mr. Gadalla Trained as an Engineer and Built Companies That Employ Thousands of People.

30. Ahmed Gadalla was born in March 1980 near Benghazi, Libya, and was raised in a household that valued education, discipline, and work.

31. He began working as a teenager. While still a student he opened a small automotive parts retailer in Benghazi called Alushibe Auto Accessories, selling parts and supplies out of a modest storefront.

32. In 2004 Mr. Gadalla earned a Bachelor of Science in Industrial Engineering from Garyounis University in Benghazi, now the University of Benghazi.

33. He has continued his education throughout his career. From approximately 2007 to 2009, he studied English in the United States at the South Bend English Institute. He obtained an extended Diploma in International Business—Strategy at SCQF Level 11 awarded by the Scottish Qualifications Authority. He participated in the Certified Manager Programme of the Chartered Management Institute. In 2025, Mr. Gadalla earned a Master of Business Administration from International Business University in Canada, where he is now pursuing a Doctor of Business Administration.

34. Mr. Gadalla's early career was in international trade. Beginning in the mid-2000s he distributed consumer and automotive products, including for ABRO Industries, Inc., an Indiana-based American manufacturer and exporter, selling ABRO products in North African markets through his own companies. He was involved in every aspect of the business, including sourcing, freight, customs, credit, and international shipping.

35. In 2008, Mr. Gadalla established Al-Mored Oasis General Trading LLC in Dubai, United Arab Emirates. It is a licensed trading company registered with the Dubai Department of

Economy and Tourism and has operated openly under that license ever since. From that base he expanded into commodities, logistics, infrastructure, and industrial investment.

36. Mr. Gadalla established Alushibe Holding Group in approximately 2020.

37. Mr. Gadalla is committed to investment and development for the betterment of his native country. His business interests span industrial development, steel, cement, food and beverage manufacturing, aviation, logistics, commodities trading, and infrastructure. Those operations and affiliated businesses employ thousands of people.

38. None of the businesses have public shareholders or have issued securities to the public.

39. Mr. Gadalla built those businesses through a period in which Libya endured revolution, civil conflict, institutional collapse, and the division of its government. Many enterprises did not survive those years. His did, not because of any political backer, but because he ran companies that made and moved real goods.

40. Mr. Gadalla's Libyan investments are documented in official registries and were made openly. Beginning in 2005, he purchased common shares in the Bank of Commerce and Development, a publicly traded Libyan commercial bank, as an investment. According to the official statement of the Libyan Stock Market dated April 8, 2026, he holds only a small minority interest of 2.89%, a position he began acquiring more than a decade before any of the event the report describes. (Exhibit 16.). He holds 2.5% of Wahda Bank, which is also recorded in the official registry. (Exhibit 14.) These are ordinary portfolio investments that are not unusual for businesspeople.

41. In 2023 Mr. Gadalla acquired shares in the Libyan Cement Company and became its Chairman. Under his chairmanship the company has invested in production capacity,

operational efficiency, and its workforce. In 2024, under his direction, the company developed approximately eighty residential homes for employees and their families.

42. Mr. Gadalla is also Chairman of Libya United Steel Company, known as SULB. SULB is privately held. It is not state-owned. The Sentry's assertion that Mr. Gadalla “chairs a state-owned steel company” is false.

43. SULB is an example of how sophisticated counterparties regarded him before the Report. SULB’s partner is Tosyalı Holding, a large international steel producer operating across multiple continents. A company of that size and stature does not commit to a long-term capital partnership without extensive diligence on its counterparty. The project contemplates one of the world’s largest Direct Reduced Iron production complexes, built on cleaner production technology, and was designed to create industrial capacity and employment in a country that badly needs both.

44. It is not the only such partnership. Mr. Gadalla’s companies have also undertaken a project with Tetra Pak, the international food-processing and packaging group, to construct what is intended to be Libya’s largest food and beverage manufacturing complex. Established multinational counterparties conducted their own diligence on Mr. Gadalla and chose to build alongside him.

45. In 2022 Mr. Gadalla relocated to Toronto, Canada, where he lives with his family as a lawful permanent resident. From Canada he oversees his companies’ international operations, has continued his education, and established Anama Inc., a Canadian corporation supporting his investment interests. He travels regularly to Europe and the United Arab Emirates for business.

**B. Mr. Gadalla’s Reputation Was Built with Business Partners, Regulators, and Employees, Not with the Public.**

46. Before April 2026, Mr. Gadalla enjoyed a good reputation among the people and institutions that worked with him—banks that extended and cleared his companies' credit, regulators that supervised the institutions in which he invested, industrial partners that committed capital alongside him, suppliers across several countries, and the thousands of employees whose livelihoods his companies support.

47. Mr. Gadalla's standing was as a successful businessman. He earned it transaction by transaction, it was verified by banks and regulators in the ordinary course, and it was unremarkable to anyone outside the commercial world in which he operated.

**C. Mr. Gadalla Did Not Seek, and Did Not Have, a Public Role.**

48. Mr. Gadalla holds no government position. He has never held elected office, never held appointed office, and never held any position in any military, security, or intelligence organization, in Libya or anywhere else. He is not a public official, a candidate, a party figure, or a spokesman for any faction.

49. Before the publications at issue, Mr. Gadalla did not participate in public debate about the Libyan conflict, Libyan banking governance, sanctions policy, or any related controversy. He issued no public statements on those subjects, published no commentary, held no press conferences, and made no attempt to influence the resolution of any such controversy.

50. Mr. Gadalla's business communications were routine descriptions of what his companies do, addressed to counterparties, employees, and prospective partners.

**D. The Sentry Decides for Itself Who Is Guilty, Then Sets Out to Make Them "Pay a Price."**

51. The Sentry is the creation of actor George Clooney and activist John Prendergast, who launched it with the Enough Project, C4ADS, and Not On Our Watch, the nonprofit Clooney co-founded. Its stated purpose is to "follow the money," to identify the people it says profit from

war and corruption, and to hand that information to governments, law enforcement, and banks so that assets are frozen, sanctions are imposed, and the people it names are "cut off from the international financial system."[1] Clooney has put the premise plainly: "Real leverage for peace and human rights will come when the people who benefit from war will pay a price for the damage they cause."[2]

52. In remarks The Sentry published on its own website, Prendergast told a Financial Action Task Force private-sector forum that, with The Sentry's support, "many banks have begun to…terminate relationships with individuals and entities in the immediate networks of those exposed by The Sentry's work," and that "[a]ccess to the global financial system through these international banks is difficult to regain once lost."[3] Clooney has described the same strategy: while "[y]ou can't shame war criminals," "[y]ou can shame people in the international community: banks and bankers, lawyers."[4]

53. After deciding for itself that Mr. Gadalla was guilty, The Sentry made him pay that price. But he did not profit from war, and he caused no damage. The only damage here is what The Sentry did to him by publishing accusations it never checked with the institutions that could have disproven them, and without giving him a meaningful opportunity to respond.

**E. The Press Release: The False and Defamatory Document the Sentry Wrote for Readers to Act On.**

---

[1] About the Sentry, https://thesentry.org/about/ (last visited Oct. 6, 2026).

[2] The Sentry, Press Release, New Investigative Project to Counter Financing of Africa's Deadliest Conflicts (July 20, 2015) (quoting George Clooney), https://thesentry.org/pressrelease072015/.

[3] John Prendergast's Remarks at FATF Private Sector Consultative Forum (Vienna, May 7, 2019), https://thesentry.org/2019/07/05/2782/john-prendergasts-remarks-fatf-private-sector-forum/.

[4] John Avlon, George Clooney's War on Kleptocracy in South Sudan, Daily Beast (Sept. 13, 2016), reposted at The Sentry (Sept. 13, 2016), https://thesentry.org/2016/09/13/1328/daily-beast-george-clooneys-war-on-kleptocracy-in-south-sudan/.

**1. The Sentry Wrote and Distributed the Press Release as a Standalone Set of Accusations.**

54. On or about April 6, 2026, The Sentry published the Report on its website, TheSentry.org, where it remains available for download worldwide.[5] (Exhibit 1.)

55. Within a day, The Sentry published and distributed the Press Release, headlined *'Eastern Libya's Money Man': New Investigation Exposes the Haftar Family's Top Fixer*. (Exhibit 2.) The Press Release is a separate publication. It appears at its own address on The Sentry's website, where it remains today.[6]

56. The Press Release was written to be read on its own. It carries a dateline in the form used for news announcements—"APRIL 7, 2025 [sic] (Washington, DC)"—and it closes with the notation "###" used to mark the end of a press release. It identifies The Sentry's Director of Communications by name and email address for media inquiries. The Press Release is roughly 1000 words written in the style of a feature article.

57. The Sentry knew that many of the people who encountered the Press Release would read only the Press Release and act on its accusations as established fact without ever reading the twenty-five-page Report.

58. The Sentry distributed the Press Release to journalists through its Director of Communications for the purpose of generating coverage of its accusations against Mr. Gadalla. Republication of the Press Release, in whole and in part, by news organizations, wire services,

---

[5] *Eastern Libya's Top Money Man: Spotlight on Ahmed Gadalla*, The Sentry (April 2026), https://thesentry.org/wp-content/uploads/2026/04/EasternLibyaMoneyMan-TheSentry-April2026.pdf.

[6] 'Eastern Libya's Money Man': New Investigation Exposes the Haftar Family's Top Fixer, The Sentry (April 7, 2026), https://thesentry.org/2026/04/07/80943/eastern-libyas-money-man-new-investigation-exposes-the-haftar-familys-top-fixer/.

aggregators, newsletters, and screening and compliance databases was the intended and foreseeable consequence of that distribution.

59. The Press Release contains no endnotes. It contains no citations. It identifies no document, no record, no interview, and no source of any kind. It does not say that any assertion in it rests on The Sentry's interviews, on The Sentry's sources, or on anyone's account but The Sentry's own. Every material assertion in it is stated flatly, in The Sentry's voice, as the established finding of an investigation.

60. On information and belief, a substantial portion of the audience that acted on The Sentry's accusations encountered only the Press Release rather than a twenty-five-page Report and the Press Release supplied the unqualified false factual allegations about Mr. Gadalla that were republished in many media and acted on by various readers.

**2. The Press Release Falsely Accuses Mr. Gadalla of Serious Crimes.**

61. The Press Release falsely states, in the subheading directly beneath its title, that The Sentry's "new investigation finds Ahmed Gadalla is the linchpin of the Haftar family's power—controlling banks, evading the UN arms embargo, distributing unauthorized dinar banknotes, and orchestrating multimillion-dollar fraud schemes to bankroll Field Marshal Haftar's power ambitions at the expense of the Libyan public."

62. The Press Release also falsely states that Mr. Gadalla is "the most versatile financial architect serving Field Marshal Khalifa Haftar and his sons," that his "simultaneous involvement in banking, arms smuggling, the printing of unauthorized dinar banknotes, letter-of-credit fraud, and transnational military procurement makes him perhaps the most emblematic illicit actor in Libya today, enabling powerful state figures to loot the nation's wealth," and that he operates "under the armed protection of Haftar's son, Saddam Haftar."

63. The Press Release adds the false allegations that Mr. Gadalla "exerts de facto control over three major Libyan banks, using them to commit fraudulent schemes and launder ill-gotten profits," and that "[h]e has overseen the printing of billions in unauthorized 50-dinar banknotes in Russia, a scheme so damaging that the Central Bank of Libya (CBL) was forced to retire all 50-dinar banknotes in April 2025."

64. The Press Release falsely states that Mr. Gadalla "holds a 60% stake in Ozon, a newly created private telecom company that challenged Tripoli's regulators on behalf of the Haftar family," that he "chairs a state-owned steel company while running a constellation of private firms in Dubai, Malta, and the UK," and that "he serves as the Haftar family's go-to architect for importing weapons in apparent violation of the UN arms embargo."

65. Under the heading "Key Report Insights," the Press Release falsely alleges that "The Sentry's findings tie Gadalla to three high-profile arms smuggling episodes since 2023," that "[i]n each case, Gadalla played a role in arranging the logistics, the financing, or both," and that "[t]o date, he has faced no consequences." It then identifies those episodes as "[t]he July 2025 interception off Greece of the Aya 1, a container ship controlled by Gadalla, which was carrying ammunition and some 200 military vehicles from the UAE to Benghazi—cargo ultimately intended for the Rapid Support Forces, a leading combatant in Sudan's brutal civil war"; "[a] major scheme to acquire Chinese FL-1 combat drones, disguised as wind turbines and funded through the National Oil Corporation, which were intercepted in southern Italy in June 2024"; and "[a] failed procurement of Spanish military drones and equipment worth 14 million euros, seized by Spain's Guardia Civil and French police in late 2023."

66. The Press Release falsely alleges that "Gadalla used utilized [sic] Emirati companies to borrow $300 million from Abu Dhabi's al-Masraf bank, backed by a guarantee

deposit from the Libyan Foreign Bank—public money from Tripoli—to help finance Haftar's April 2019 offensive on Tripoli." It states that "[t]he military operation, which involved payments to Russian combatants from the Wagner Group, failed after 14 months of destruction." And it states that "the loans were never fully repaid, leaving the Libyan public holding the bill for an attack on their own capital."

67. Immediately after that passage, and under the same heading, the Press Release falsely states: "Meanwhile, Gadalla lives lavishly. He carries a St. Kitts passport, flies on a private jet, and owns a $3.7 million condominium in one of Toronto's most exclusive neighborhoods. He maintains permanent residency in Canada." It continues: "That an obscure Libyan fixer—not a warlord or a politician—has managed to accumulate such vast wealth and responsibilities, is itself a measure of how deeply the system is broken." In that position and in that context, those assertions convey that Mr. Gadalla's home, his aircraft, and his wealth are the proceeds of the criminal schemes described in the preceding sentences.

68. The Press Release publishes the following statement attributed to Justyna Gudzowska, The Sentry's Executive Director: "Ahmed Gadalla helps the Haftar family turn military force into cash and cash into weapons. He helped bankroll a devastating assault on Tripoli with Libyan public funds, participated in flooding the economy with unauthorized dinar banknotes, and orchestrated arms shipments that appear to defy international law—all without facing a single consequence. For ordinary Libyans to ever see the benefits of their country's wealth, such impunity must end."

69. The Press Release publishes the following statement attributed to Oliver Windridge, The Sentry's Senior Advisor for UK and EU: "Gadalla might be prolific, but he's not an outlier. He represents an entire class of enablers who do the dirty work for Libya's warlords—

laundering money, smuggling arms, subverting local banks—while hiding behind political protection and armed cover. Issuing international sanctions now against Gadalla and his network would send a clear message that the international community is willing to go beyond the warlords themselves and dismantle the illicit financial flows that sustain them."

70. The Press Release does not merely accuse; it demands action. Under the heading "Key recommendations in the report," in three unqualified bullet points The Sentry seeks: targeted sanctions by the United States, Canada, the United Kingdom, and the European Union; an order by the UAE that domestic firms sever ties with Mr. Gadalla; and an independent investigation by al-Masraf's shareholders.

**3. The Press Release Removes the Qualifications That Appear in the Report.**

71. The Report attempts to qualify certain of its most serious factual accusations—hedging them with words like "likely" and "appears," and attributing them to unnamed sources rather than asserting them outright. The Press Release strips out those qualifications and states the same underlying facts flatly, as established results of The Sentry's own investigation: who paid the Wagner Group, who controls the banks, who oversaw the printing of counterfeit currency, who controls the Aya 1, and what ties Mr. Gadalla to the arms episodes. A reader of the Press Release has no way to know that The Sentry was not prepared to state these things as certainties in the Report. The effect on a Press Release reader is to convey that these are well-investigated, established facts. The examples that follow show the pattern:

72. *The Wagner Group.* The Report's Executive Summary states that the funds "were funneled by Gadalla's companies into the war effort, *likely* including payments to Russia's Wagner Group." The Report's body states that the funds "most *likely* bankrolled Wagner mercenaries' deployment," and states that the circumstances it recites "reinforce *the allegation of The Sentry's sources* that at least part of the $300 million in loaned funds went to Wagner." The Press Release

states, without qualification, that the offensive was one "which *involved* payments to Russian combatants from the Wagner Group."

73. *Control of the banks.* The Report states that "[a]ccording to The Sentry's sources, Gadalla wields de facto control over the Benghazi-headquartered bank, despite holding no formal authority there." The Press Release states, without qualification and without attribution, that Mr. Gadalla "exerts de facto control over three major Libyan banks, using them to commit fraudulent schemes and launder ill-gotten profits."

74. *Counterfeit currency.* The Report states that "[b]ased on The Sentry's interviews with banking officials and others in the banking sector, Gadalla was the main person overseeing the *distribution* of these counterfeit dinars," and attributes the printing of those notes to Goznak, a Russian state firm. The Press Release states, without qualification and without attribution, that Mr. Gadalla "has overseen the *printing* of billions in unauthorized 50-dinar banknotes in Russia."

75. *The ship.* The Report describes the Aya 1 as "the Alushibe Group's" vessel and as "a Dubai maritime company under his control." The Press Release states, without qualification, that the Aya 1 is "a container ship controlled by Gadalla."

76. *The arms episodes.* The Report states that the drone transfer "*appears* to have violated" the arms embargo and that another incident "*likely* violated" it. The Press Release states, without qualification, that "The Sentry's findings tie Gadalla to three high-profile arms smuggling episodes since 2023," and that "[i]n each case, Gadalla played a role in arranging the logistics, the financing, or both."

**4. The Press Release Removes the Source Attributions That Appear in the Report.**

77. The Report repeatedly discloses that its most serious assertions come not from documents but from unnamed people The Sentry says it interviewed. Its recurring formulations

are "[a]ccording to The Sentry's sources," "[b]ased on The Sentry's interviews with banking officials and others in the banking sector," "[a]ccording to a senior LFB official," and "the allegation of The Sentry's sources."

78. Not one of those attributions was included in the Press Release. In the Press Release, what The Sentry's unnamed sources are said to have alleged becomes what The Sentry's "investigation finds."

**5. The Press Release Enlarges the Report's Accusations.**

79. In three respects the Press Release does not merely restate the Report without qualification, it accuses Mr. Gadalla of more than the Report accused him of.

80. *From one bank to three.* The Report's claim of de facto control, attributed to The Sentry's sources, concerns the Bank of Commerce and Development. The Press Release asserts de facto control over "three major Libyan banks," and adds that Mr. Gadalla uses all three "to commit fraudulent schemes and launder ill-gotten profits."

81. *From distribution to printing.* The Report attributes the printing of the counterfeit notes to a Russian state firm and asserts, on the basis of interviews, that Mr. Gadalla oversaw their distribution inside Libya. The Press Release asserts that Mr. Gadalla "has overseen the printing" of those notes "in Russia." The Press Release thus places Mr. Gadalla at the head of an operation the Report itself attributes to someone else.

82. *From association to control.* The Report attributes the Aya 1 to "the Alushibe Group." The Press Release attributes the vessel to Mr. Gadalla personally, as a ship "controlled by Gadalla," and states flatly that its cargo was "ultimately intended for the Rapid Support Forces, a leading combatant in Sudan's brutal civil war."

**F. The Report: Despite Its Attempts to Hedge, It Asserts False Accusations of Serious Crimes, Built on Sourcing That is Largely Anonymous and Circular.**

**1. The Report's Accusations.**

83. The Report's Executive Summary states its thesis in its opening lines: the Report "exposes the financial machinery that underwrote a significant part of Field Marshal Khalifa Haftar's failed 2019–2020 offensive on Tripoli and documents the subsequent rise of a key enabler of the Haftar family's kleptocratic activities: Ahmed Gadalla."

84. The Report falsely alleges: "Prior to the April 2019 assault, Gadalla utilized a set of companies based in the United Arab Emirates (UAE) to secure $300 million in loans from the Abu Dhabi-based Arab Bank for Foreign Investment and Trade, commonly known as al-Masraf bank. These funds, backed by a guarantee deposit from the Libyan Foreign Bank (LFB), were funneled by Gadalla's companies into the war effort, likely including payments to Russia's Wagner Group. After Haftar's offensive collapsed, the loans have remained largely unpaid, leaving the Libyan public to bear the financial burden while Gadalla has faced no accountability."

85. The Report also falsely states: "Gadalla has wielded control over the Bank of Commerce and Development (BCD) and other financial institutions in eastern Libya, such as Wahda Bank and National Commercial Bank, using them to facilitate large-scale letter-of-credit fraud and to launder illicit profits. Through his control of BCD, Gadalla is also involved in the circulation of counterfeit Russian-printed dinars, a scheme that has helped undermine Libya's local currency."

86. The Report continues its false attacks on Mr. Gadalla: "Beyond financial abuses, Gadalla has served as a key enabler for the Haftar family's transnational arms smuggling in apparent violation of the United Nations (UN) arms embargo on Libya. Gadalla helped orchestrate several recent high-profile schemes, playing an active role in arranging the intricate payment structures and logistical routes necessary to illicitly transfer military equipment to Benghazi. Incidents include the Haftars' attempted importation of Chinese combat drones disguised as wind

turbines in 2024 and their failed procurement of Spanish drones the prior year, not to mention the July 2025 shipment of armored vehicles and ammunition from the UAE intended for the Rapid Support Forces (RSF) militia in Sudan."

87. An entire section of the Report is titled "Gadalla Now: The Haftars' Fixer for Money and Arms." The Report falsely asserts that Mr. Gadalla operates "under the protection of Saddam Haftar," that he "influenced the day-to-day operations of BCD," that he "rose to become BCD's de facto chief," that he "took control of the BCD for the Haftar family," and that "Gadalla was the main person overseeing the distribution of these counterfeit dinars."

88. The Report further falsely claims that "Gadalla's three Dubai-based entities later appeared on a blacklist issued by the CBL owing to suspected letter-of-credit fraud, with an investigation by the Libyan attorney general pending."

89. As to maritime smuggling, the Report falsely alleges that "[i]n 2025, an arms smuggling incident off Greece implicated Gadalla and UDS Shipping Services, a Dubai maritime company under his control," and that "[i]n late July 2025, the Alushibe Group's 475-foot container ship, the Aya 1, lifted 350 containers filled with ammunition and about 200 large military-use vehicles from the UAE and headed for Benghazi," describing the shipment as "ultimately intended for the RSF in Sudan."

90. As to the Spanish drone matter, the Report continues its false attack by alleging that "Yusef al-Ubeidi, the Madrid-based individual suspected of having helped coordinate the arms purchase, told investigators that Gadalla, acting for Saddam Haftar, was involved," and that "one of Gadalla's Dubai firms played a role in the scheme, which included wiring 14 million euros to the Spanish firms."

91. And the Report falsely brands Mr. Gadalla "a key enabler of the Haftar family's kleptocratic activities" and one of the "'enablers' who take advantage of institutional weakness and armed protection to help powerful figures loot state wealth."

92. The Report does not stop at accusation. It is built to produce governmental action against the man it names, and it says so.

93. The Report's Executive Summary urges that "the United States, Canada, the United Kingdom, and the European Union (EU) impose targeted network sanctions on Ahmed Gadalla, his companies, and his associates." Its Recommendations section then sets out a program of demands addressed to the United States, the United Kingdom, the European Union, Canada, and the United Nations Security Council: that the United States, United Kingdom, and Canada "designate Gadalla under their respective Global Magnitsky-style sanctions regimes," that the Security Council and the EU designate him on the precedent of a prior Libya listing, and that other member states "designate Gadalla for economic crimes and violations of the arms embargo."

94. The demands do not stop at designation. The Report urges the United States, United Kingdom, and European Union to "issue business advisories that warn companies against any engagement with entities controlled or influenced by" persons it labels politically exposed, "such as Gadalla." It urges the authorities of the United Arab Emirates to "direct Emirati firms to avoid commercial and banking ventures with Gadalla, as well as with the companies he controls," with "penalties . . . enforced for violations," and to open a money-laundering investigation of him. It urges Emirati financial regulators and al-Masraf's shareholders to investigate the bank's dealings with "all Alushibe Group entities and all other Gadalla-linked accounts," and urges the governments of the UAE, Libya, and Algeria to "pursue legal action against those responsible for the $300 million diversion." It urges global correspondent banks to increase monitoring. And it

urges Libyan authorities to "[r]efer the al-Masraf case for prosecution," referring evidence "involving Gadalla to the Attorney General's Office for prosecution."

### 2. The Report's 400 Endnotes Do Not Support Its Accusations.

95. The Report carries 400 endnotes. Apparently, The Sentry believed that including hundreds of endnotes would give the appearance of a well-sourced investigative report. But quantity is not a substitute for substantiation. Of the Report's 400 endnotes: (1) approximately ninety are citations to The Sentry's own interviews with unnamed sources; (2) more than twenty of the endnotes are citations to The Sentry's own statements, assessments, or inferences with no external source at all; and (3) approximately fifteen are self-citations to The Sentry's own prior reports. In short, roughly one-third of the Report's citations are The Sentry citing itself or citing a person it will not name.

96. Critically, the Report's most serious accusations against Mr. Gadalla are largely "supported" only by these unverifiable citations. Where the Report accuses Mr. Gadalla of crimes and other wrongdoing, its support is almost always an unnamed person. Where the report cites a document, the document frequently concerns something else. The other two-thirds of the endnotes purportedly support background information, such as the general conflict in Libya and various U.N. charters, with no relation to Mr. Gadalla or the allegations against him.

97. Simply, the Sentry's 400 endnotes are intended to signal to the readers, journalists, and the governments The Sentry lobbies that the accusations rest on a documented record. They do not.

## G. The Accusations Are False, and Official Records Prove It.

### 1. Mr. Gadalla Did Not Take $300 Million in Loans, Did Not Finance the Tripoli Offensive, and Did Not Pay the Wagner Group.

98. Every component of the $300 million accusation is false. Mr. Gadalla did not use his companies to obtain $300 million in loans from al-Masraf. His companies did not funnel money to the Haftar war effort. They did not pay the Wagner Group, directly or indirectly. And there is no unpaid nine-figure loan balance attributable to Mr. Gadalla or to any company in which he holds an interest.

99. Al-Masraf itself, the lending bank at the center of the accusation, has certified in an official written statement dated April 9, 2026 that Al-Mored Oasis General Trading LLC, the company in which UAE licensing records record Mr. Gadalla's shareholding, "has no liabilities toward Al Masraf." (Exhibit 3.) That is the bank's own statement about its own loan book, issued in the very period in which The Sentry asserted, in the present tense, that the loans "have remained largely unpaid."

100. The Libyan Foreign Bank's own internal investigation tells the rest of the story. In 2023 the LFB convened a Fact-Finding Committee to investigate the $300 million deposit-and-guarantee arrangement at al-Masraf that the Report describes. The Committee's Report No. 107 of 2023, a twenty-two-page confidential investigative report signed on January 17, 2024—more than two years before the Report—found that the informal undertaking and guarantee letter dated March 24, 2019, were signed not by Mr. Gadalla but by Mohammed Najib Hamida Al-Jamal, then the acting General Manager and an LFB board member; that the obligations purportedly guaranteed were those of three companies with no connection to Mr. Gadalla; that the guarantee documents were likely unauthorized and possibly fraudulent, having exceeded the signatory's individual authority and appearing in no official LFB record; and that Mr. Al-Jamal and the 2019 board members should be referred to the Deputy Attorney General for criminal investigation. (Exhibit 4.) Mr. Gadalla is not mentioned anywhere in the Committee's twenty-two pages.

101. An independent professional examination of al-Masraf's books says the same thing. In August 2025, eight months before publication, a Big Four accounting firm completed a due-diligence review of al-Masraf's entire credit portfolio for a prospective third-party acquirer, working from the bank's own credit files as of March 2025. (Exhibit 5.) At pages 55 and 56 of that review, the firm identifies the borrowers associated with the $300 million Libyan Foreign Bank guarantee as two affiliated Libyan entities—neither of which is Mr. Gadalla, Al-Mored Oasis General Trading LLC, or any company connected to him. Neither Mr. Gadalla nor Alushibe Holding Group nor any affiliated entity appears anywhere in al-Masraf's credit portfolio as a borrower.

102. The Libyan Attorney General's Office, whose purportedly pending investigation the Report invokes as corroboration, certified in writing on April 15, 2026, that its records contain no guarantee document naming Mr. Gadalla, no al-Masraf loan to him or to Al-Mored Oasis General Trading LLC, and no Libyan Foreign Bank guarantee in connection with either. (Exhibit 6.)

103. The Central Bank of Libya's Financial Information Unit and its Department of Banking and Cash Control have further confirmed that there are no suspicious-transaction reports and no anti-money-laundering concerns regarding Mr. Gadalla. (Exhibits 7, 8.)

104. The Wagner Group accusation rests on nothing but stacked inference from false claims. The Report reasons that because the UAE has "frequently served as a hub in Wagner-linked revenue chains," and because the Wagner Group fought in the Tripoli offensive, "the allegation of The Sentry's sources that at least part of the $300 million in loaned funds went to Wagner" is "reinforce[d]." Mr. Gadalla has never made, arranged, facilitated, or been party to any

payment to the Wagner Group. There was no $300 million loan to him from which any such payment could have been made.

**2. There Is No Central Bank Blacklist of Mr. Gadalla's Companies, and No Attorney General Investigation of Him.**

105. The Central Bank of Libya's Department of Banking and Cash Control, the department that would have issued any such blacklist, has certified in a formal written statement signed by its Deputy Director that "no circulars have been issued by the Department of Banking and Cash Control at the Central Bank of Libya against companies affiliated with Alushibe Holding Group." (Exhibit 7.)

106. The companion assertion—that an "investigation by the Libyan attorney general" was "pending" as to Mr. Gadalla's companies—is false as well. On April 15, 2026, the Investigation Unit of the Office of the Attorney General of Libya reviewed the investigation file opened on the Libyan Foreign Bank's report concerning the al-Masraf guarantee document and certified that Mr. Gadalla's name does not appear in the guarantee document that is the subject of that report; that it has not been established, upon examination and verification, that Mr. Gadalla or the entities dealing with him obtained any financing or loan from al-Masraf; and that no records exist in the Office's registers or electronic system indicating that Mr. Gadalla or Al-Mored Oasis General Trading LLC obtained any guarantee issued by the Libyan Foreign Bank. (Exhibit 6.)

107. The Report's own text confirms as much. Discussing the al-Masraf transactions, the Report states that "the Libyan Attorney General's inquiry, which seems to focus on former LFB general manager Jamal, remains ongoing." That is an acknowledgment, sourced to The Sentry's own interviews with a Libyan official close to that Office, that the inquiry concerns the former LFB general manager who signed the guarantee documents and not Mr. Gadalla. And the Report's Recommendations urge Libyan authorities to "[r]efer the al-Masraf case for prosecution,"

recommending that evidence "involving Gadalla" be referred to the Attorney General's Office for prosecution.

### 3. Mr. Gadalla Does Not Control the Bank of Commerce and Development, Wahda Bank, or National Commercial Bank, and the Banking-Fraud and Counterfeiting Accusations Are False.

108. Official share-registry records refute the premise of control. The Libyan Stock Market, the official registry of shareholdings in Libya's publicly traded banks, records that Mr. Gadalla holds 2.5% of the shares of Wahda Bank. (Exhibit 14.) That is not control. The same registry records that Mr. Gadalla holds no shares of National Commercial Bank. (Exhibit 15.) And National Commercial Bank itself has certified in writing that it has never had any relationship of any kind with Mr. Gadalla or any entity affiliated with him: no accounts, no facilities, and no transactions. (Exhibit 17.) The Sentry accused Mr. Gadalla of using, for fraud and money laundering, a bank with which he has never had a relationship of any kind.

109. As to the Bank of Commerce and Development, official records show Mr. Gadalla to be a minority shareholder in a publicly traded bank, holding 1,736,690 shares, or 2.89%, against a statutory ceiling of 5% for any individual. (Exhibit 16.) He began acquiring his shares openly in 2005—seventeen years before The Sentry says he "took control of the BCD for the Haftar family" in 2022. He does not make management decisions for the bank, does not direct its operations, and did not acquire or exercise control of it for the Haftar family or for anyone else.

110. Wahda Bank's General Manager has certified in a formal written statement that any letters of credit issued to Mr. Gadalla's companies were executed in accordance with legal procedures and approved banking controls; that all imports were made pursuant to valid official documents and approved contracts; and that no letters of guarantee, documentary credits, or personal financial transfers have been issued in the name of Mr. Gadalla in his personal capacity. (Exhibit 9.)

111. The counterfeit-currency accusation is false in both the form the Report gives it and the enlarged form the Press Release gives it. Mr. Gadalla has never participated in, overseen, facilitated, or profited from the printing, importation, distribution, or circulation of counterfeit currency. He has never had any relationship with Goznak or with any other printer of currency. He did not oversee the printing of any banknote in Russia or anywhere else. The Central Bank of Libya's certifications that there are no suspicious-transaction reports and no anti-money-laundering concerns regarding Mr. Gadalla cannot be reconciled with the accusation that he ran a currency-counterfeiting operation through a regulated bank. (Exhibit 7.)

**4. Mr. Gadalla Does Not Own, Operate, or Control UDS Shipping Services LLC.**

112. Every maritime allegation in both publications rests on a single premise: that UDS Shipping Services LLC, the Dubai company that owns the MV Aya 1, is under Mr. Gadalla's ownership or control. The premise is false.

113. The official commercial license issued by the Dubai Department of Economy and Tourism identifies UDS Shipping Services LLC as a "Limited Liability Company – Single Owner (LLC-SO)" and identifies a single shareholder and manager: Sultan Ahmad Abdulqader Al-Shanqiti, a UAE national holding 100% of the company's shares. Mr. Gadalla's name appears nowhere in the document. (Exhibit 9.) The company's Memorandum of Association, as amended and electronically notarized by the Dubai Department of Economy and Tourism, identifies Mr. Al-Shanqiti as the sole owner throughout the company's existence since its incorporation on July 13, 2021. (Exhibit 11.) The corporate file's Power of Attorney authorizes a third party, not Mr. Gadalla, to manage the company on Mr. Al-Shanqiti's behalf. (Exhibit 11.)

114. The UAE government's official Statement of Partner/Owner Licenses for Mr. Gadalla confirms the same fact from the other direction. That statement, issued March 26, 2026, lists Mr. Gadalla's complete licensing record in the Emirates, and that record contains no

connection to UDS Shipping in any capacity: not as owner, not as shareholder, not as manager, not as agent. (Exhibit 18.)

115. Mr. Gadalla does not own UDS Shipping. He does not manage it. He does not direct, instruct, finance, or benefit from it. He exercises no control over it of any kind. He did not arrange, orchestrate, finance, or participate in the July 2025 voyage of the MV Aya 1 or in any other voyage of any UDS vessel, and he has never used any vessel to transport weapons, ammunition, or military equipment to the Rapid Support Forces or to anyone else.

116. The Office of the Focal Point established pursuant to United Nations Security Council Resolution 2146, the body charged with monitoring illicit Libyan petroleum exports, has confirmed that it has no information connecting Mr. Gadalla to UDS Shipping or to illegal oil exports. (Exhibit 19.)

**Subject:** Re: Ahmed Gadalla
**Date:** Monday, April 20, 2026 at 2:36:46 PM Pacific Daylight Time
**From:** Emad Benragaib [redacted]
**To:** Mitch Langberg [redacted]

Dear Mr. Langberg

Thank you for your email.

Following a review of the available official files and reports, I can confirm that we have found no relationship, ownership, management role, or other connection between Mr. Ahmed Gadalla, or any of his companies, and UDS Shipping Services LLC.

I can also confirm that, based on the files and reports reviewed, we have found no indication that Mr. Gadalla or any of his companies have been involved in any illegal oil exports.

This confirmation is provided based on the information currently available in the relevant official records reviewed by our office.

Please do not hesitate to contact me should you require any further clarification.

Kind regards,
Focal Point SC 2146 - ( 2014 )
Imad A. Salem

*Exhibit 19: Email of April 20, 2026 from Imad A. Salem, Libya's Focal Point under United Nations Security Council Resolution 2146 (2014), to counsel for Mr. Gadalla (e-mail addresses redacted).*

117. The Sentry's ownership claim rested almost entirely on a profile in the Lloyd's List Intelligence maritime database, which endnote 328 of the Report states The Sentry reviewed in June 2025, some ten months before publication. Before the Report was published, Lloyd's List Intelligence formally removed that entry. Its written confirmation states without qualification: "We have now removed the link between the Alushibe Holding Group and UDS Shipping Services LLC in our database." (Exhibit 12.)

**From:** Ask the Analyst <[redacted]>
**Date:** Wednesday, 1 April 2026 at 11:00
**To:** Bridget Heath <[redacted]>
**Cc:** Shirrine Amblavaney <[redacted]>
**Subject:** Re: [319698] Ask the Analyst from Lloyds List | UDS Shipping Services LCC

Dear Bridget,

Thank you for you enquiry.

We have now removed the link between the Alushibe Holding Group and UDS Shipping Services LLC in our database.
Please do not hesitate to reach out if you require further clarification.

Kind regards,
**Geethika Viswaprasad | Ask the Analyst Service**
Maritime Data Analyst | Lloyd's List Intelligence

Lloyd's List Intelligence

Home of
Seasearcher
AIS SeaOrbis
Lloyd's List, Insurance Day, Lloyd's Law Reports
Legal and Maritime Publications
i-law
Infospectrum

bsi ISO 9001 Quality Management Systems CERTIFIED

Regulation Asia Awards for Excellence 2023

Winner
Lloyds List Intelligence
Best TBML & Trade Compliance Solution

*Exhibit 12: Lloyd's List Intelligence confirmation removing the link between Alushibe Holding Group and UDS Shipping Services LLC. (E-mail addresses redacted.)*

118. Worse, The Sentry's own endnote 325 cites the Dubai Chamber of Commerce membership certificate for UDS Shipping, a document drawn from the same official registry system that records Mr. Al-Shanqiti as the company's sole owner. (Exhibit 11.) The Sentry thus possessed and reviewed official documentation of UDS Shipping's ownership, and published the opposite.

**5. Mr. Gadalla Had No Involvement in the 2023 Spanish Drone Matter.**

119. Mr. Gadalla had no involvement of any kind in the 2023 Spanish drone matter. No company of his wired 14 million euros, or any sum, to Spanish arms manufacturers in connection with that or any other arms transaction. He has never been arrested, charged, questioned, or named as a suspect by Spanish or French authorities.

120. The Report attributes to Yusef al-Ubeidi, a named individual, a statement that Mr. Gadalla, "acting for Saddam Haftar, was involved" in the arms purchase. Mr. al-Ubeidi has

attested, in writing and through international counsel, that the attribution is "rotundamente falsa." In a letter transmitted by his international law firm on April 15, 2026, he stated that he never conveyed any information to Guardia Civil investigators concerning Mr. Gadalla; that he never conveyed to The Sentry or to any other organization the information the Report attributes to him; that he has no information suggesting that Mr. Gadalla or his companies were involved in any drone-related transaction; and that, to his knowledge, neither Mr. Gadalla nor his companies have any connection to the drone trade. (Exhibit 20.) On April 17, 2026, a retraction demand was sent to The Sentry on his behalf. The statement the Report attributes to Mr. al-Ubeidi was never made, and the accusation it is offered to support is false.

**6. The Chinese Drone Accusation Is False.**

121. Mr. Gadalla had no involvement in any attempted importation of Chinese FL-1 combat drones. He had no role in payment structures, logistics, procurement, negotiation, or approval, and no role in any use of the National Oil Corporation to fund any such purchase. He has never been charged, questioned, or named by any of the authorities that investigated the FL-1 interception in Italy in June 2024. Neither publication offers any documentary support connecting him to the episode.

**7. The Press Release's Additional Assertions About Ozon, SULB, and Mr. Gadalla's Personal Wealth Are False and Falsely Framed.**

122. The Press Release asserts that Mr. Gadalla "holds a 60% stake in Ozon, a newly created private telecom company that challenged Tripoli's regulators on behalf of the Haftar family." That assertion is false. Mr. Gadalla holds no stake, of 60% or any other size, in Ozon, directly or in his own name. He holds an interest in a separate company that, in turn, holds a 20% interest in Ozon. His interest in Ozon, through that intermediate company, is therefore indirect

and non-controlling—the opposite of the 60% direct, controlling stake the Press Release attributes to him.

123. The Press Release asserts that Mr. Gadalla "chairs a state-owned steel company." Libya United Steel Company is not a state-owned enterprise. It is a joint venture whose partner is Tosyalı Holding, a private international industrial group, and Mr. Gadalla's chairmanship of it is not the stewardship of state property that the Press Release conveys.

124. The Press Release's assertions about Mr. Gadalla's residence, aircraft, and travel documents are set out by context and juxtaposition to convey that his assets are the proceeds of the criminal schemes the Press Release describes in the immediately preceding sentences. That implication is false. Mr. Gadalla's assets are the product of more than two decades of lawful trading, logistics, and industrial enterprise, documented in official corporate registries and financed through banking relationships that the banks themselves have certified were lawful.

**8. The Defamatory Message of Both Publications Is False.**

125. Beyond their discrete false assertions, the Report and the Press Release each communicate a false and defamatory message that Ahmed Gadalla is a war financier, arms trafficker, fraudster, money launderer, and kleptocratic "fixer" who built his fortune by looting Libyan state wealth in the service of a warlord family.

126. That narrative is false. Mr. Gadalla is a businessman whose investments are documented in official registries, whose banking relationships have been certified lawful by the institutions themselves and by the Central Bank of Libya, and whose supposed war chest, ships, blacklists, prosecutions, and confessions all dissolve on contact with the official record.

**H. The Sentry Purposefully Avoided the Truth by Avoiding the Authority Whose Power It Invoked.**

127. The Sentry did not merely fail to consult the Libyan Attorney General's Office. It vouched for that Office, built part of its story on voices claiming proximity to it, and called upon it to act, all while never putting a question to it.

128. First, The Sentry told its readers that the Office had opened an inquiry. The Report states that "[i]n 2024, the LFB presented documentation to the Libyan Attorney General's Office, seeking a formal inquiry, which was launched that year", and separately asserts that an "investigation by the Libyan attorney general" was "pending" as to Mr. Gadalla's companies.

129. Second, The Sentry's disclosed sourcing for those assertions was interviews with "a Libyan official close to the Attorney General's Office," conducted in December 2024 and again in December 2025.

130. Third, The Sentry called on that Office to act. Its Recommendations urge Libyan authorities to refer evidence concerning the 2019 payments "and related offenses involving Gadalla to the Attorney General's Office for prosecution." The Sentry thereby acknowledged that it regarded the Office as the competent authority to determine whether the conduct it described had occurred.

131. Fourth, when Mr. Gadalla's representatives inquired, the Office reviewed its records and certified in writing on April 15, 2026, that its records contain no guarantee document, no al-Masraf loan, and no LFB guarantee in connection with Mr. Gadalla. (Exhibit 6.) On information and belief, had The Sentry directed the same inquiry to the Office at any time before publication, the Office would have conducted the same search and given the same answer. And even if The Sentry supposed the Office would not respond to a private organization, had it given Mr. Gadalla a meaningful opportunity to respond when he asked for one, he could have obtained that certification and provided it. While The Sentry acknowledged this Office as the competent

authority by calling for it to act upon the Report, when presented with this certification, The Sentry merely stated that it "remains confident in the accuracy of its reporting" and failed to address it specifically.

132. Fifth, The Sentry's own reporting shows that its sources close to the Office told it something that undercut its thesis: that the inquiry "seems to focus on former LFB general manager Jamal." The Sentry published that concession, in passing, deep in the body of the Report while telling readers in its Executive Summary, and telling the press in its Press Release, that Mr. Gadalla was the man who financed the war.

133. The Sentry invoked the authority of the Libyan Attorney General's Office, sourced its story to people claiming access to that authority, and summoned that authority to prosecute Mr. Gadalla. Yet it declined to ask that authority a single question. On information and belief, The Sentry avoided inquiry of the Attorney General's Office because it harbored serious doubts about its accusations and did not want those doubts resolved in a manner inconsistent with its preconceived narrative.

**I. The Sentry Built Its Story on Anonymous and Interested Sources While Avoiding the Institutions That Keep Records.**

134. The Report relies on sources identified only generically: "a senior LFB official," "a Benghazi activist familiar with the banking sector," "a western-Libyan banker familiar with banking abuses in eastern Libya," "a veteran Libyan banker familiar with the banking sector in eastern Libya," and similar formulations. Not one is identified by name, by position, or by any basis of personal knowledge for the specific conduct attributed to Mr. Gadalla.

135. The Report's own narrative concerns a violent factional conflict over the control of Libyan money, and persons positioned to speak about it are, by the Report's own account, aligned

with one side or the other. The Sentry disclosed nothing about its sources' interests, and it corroborated their accounts against no record.

136. While leaning on those voices, The Sentry avoided the institutions that keep records. On information and belief, it did not ask al-Masraf to verify the current status of the loans it described as unpaid. It did not ask the Central Bank of Libya about the blacklist it claimed the bank had issued. It did not ask the Libyan Stock Market about Mr. Gadalla's shareholdings, which would have shown a 2.5% and a 2.89% minority position rather than control. It did not re-query Lloyd's List Intelligence about the ten-month-old database entry on which its central ship-ownership claim depended. And, as set forth above, it did not ask the Libyan Attorney General's Office about the investigation it described as pending.

137. Each of those inquiries was simple. Each was available. Each would have revealed falsity before publication.

**J. The Sentry Denied Mr. Gadalla Any Meaningful Opportunity to Respond.**

138. The Sentry's investigation was not rushed. Its endnotes reflect source interviews dating to 2022 and research continuing through late 2025. The Sentry had years to prepare its accusations and to prepare its target's opportunity to answer them. Nothing about the Report or the Press Release was time sensitive.

139. Against that multi-year effort, The Sentry claims that its pre-publication outreach to Mr. Gadalla consisted of requests for comment emailed in late February 2026 to two email addresses, to which it says it received no response. By The Sentry's own account, that was the end of its effort. It made no follow-up call, sent no letter by mail or courier, and made no attempt to reach Mr. Gadalla through his companies' offices, their published telephone numbers, or their officers.

140. Whatever became of those emails, Mr. Gadalla is not hard to reach, and the proof came days before publication at one of the very addresses The Sentry says it used.

141. On April 2, 2026, at 3:37 p.m., Rita Trichur, a reporter for *The Globe and Mail* in Canada, emailed Mr. Gadalla at one of the two addresses to which The Sentry claims it directed its requests for comment, seeking his response to The Sentry's allegations. Her message recited those allegations in specific detail, including the $300 million in al-Masraf loans, the Libyan Foreign Bank guarantee deposit, the claimed control of BCD, Wahda Bank, and National Commercial Bank, and the letter-of-credit and counterfeit-currency claims.

142. Mr. Gadalla responded within the hour, at 4:27 p.m. A journalist who actually wanted to hear from Mr. Gadalla reached him with a single email and had her answer in fifty minutes.

143. Ms. Trichur's inquiry revealed something else. Her email recited many of The Sentry's specific factual allegations in detail—including the $300 million in al-Masraf loans, the Libyan Foreign Bank guarantee deposit, the claimed control of BCD, Wahda Bank, and National Commercial Bank, and the letter-of-credit and counterfeit-currency claims—before either publication had reached Mr. Gadalla or, so far as he was aware, the public. Whatever the precise document or account she had seen, The Sentry had already shared many of its false factual allegations with at least one journalist before publication, on information and belief in order to orchestrate amplifying coverage timed to its release.

144. Believing that Ms. Trichur was describing a report that had already been published, Mr. Gadalla told her that he was unaware of any report by The Sentry, could not locate one, and asked that she provide it so that he could meaningfully respond.

145. She replied at 4:46 p.m.: "My understanding is that The Sentry has already provided you with the details of their various allegations. Is that not true? I will contact them and ask them to provide you with a copy of their report."

146. Mr. Gadalla wrote again that evening, reiterating that he had received no report and no underlying materials and asking for the documents and a reasonable opportunity to respond. (Exhibit 13.)

**From:** Ahmed Alushibe <[redacted]>
**Sent:** Thursday, April 2, 2026 4:27 PM

Ms. Trichur,

I have received your email. It appears that you have been working on this story for a long time. Yet you are only providing me a few days to respond to very serious allegations. As you must know, it is very hard to prove a negative. And, with the nature and type of allegations you are putting forward, the tie you are offering to respond is not reasonable. If you are committed to the truth in your reporting, you will allow reasonable time to respond. Accepted journalist standards demand that much.

Also, you refer to a report by The Sentry on which you plan to base your own reporting. I am unaware of any such report and I cannot locate it. Would you please forward that to me so that I have an meaningful opportunity to respond to the allegations you plan to report on?

---

---------- Forwarded message ---------
From: **Trichur, Rita** <[redacted]>
Date: Thu, Apr 2, 2026 at 4:46 PM
Subject: RE: Urgent request for comment from The Globe and Mail in Canada
To: Ahmed Alushibe <[redacted]>

Mr. Gadalla,

Thank you for your e-mail. My understanding is that The Sentry has already provided you with the details of their various allegations. Is that not true? I will contact them and ask them to provide you with a copy of their report.

Best,

Rita

*Exhibit 13: Mr. Gadalla's reply of April 2, 2026 at 4:27 p.m. and Ms. Trichur's response at 4:46 p.m. (e-mail addresses redacted).*

147. On information and belief, Ms. Trichur did what she said she would do: she contacted The Sentry and informed it that Mr. Gadalla said he had never received its allegations

and was asking for its report so that he could respond. The Sentry therefore had notice, days before publication, that the target of its accusations had not received them, was actively seeking them, and stood ready to answer them.

148. The Sentry did not send Mr. Gadalla the Report. It did not renew its outreach. It did not resend its questions. It did not extend its timeline by a single day.

149. Had The Sentry given Mr. Gadalla the opportunity to respond that he asked for, he could have obtained and provided much of the evidence set out in this Complaint, including the certification of the Libyan Attorney General's Office, the confirmation that Lloyd's List Intelligence had removed the UDS entry, and the certifications of the banks. The Sentry would have suffered no prejudice from waiting. It was more committed to its narrative than to the truth.

### K. Mr. Gadalla Demanded Retraction, Delivered the Proof of Falsity, and The Sentry Refused.

150. On April 13, 2026, within days of publication, Mr. Gadalla's counsel wrote to The Sentry's Executive Director and General Counsel demanding retraction and apology. The letter identified the central falsities in both publications and enclosed official records refuting them, including the Dubai commercial license establishing UDS Shipping's sole owner, the UAE Statement of Partner/Owner Licenses for Mr. Gadalla, the Lloyd's List Intelligence removal confirmation, al-Masraf's certification of no liabilities, the Central Bank of Libya's certification that no blacklist circulars exist, and Wahda Bank's certification of lawful transactions.

151. On April 20, 2026, counsel supplemented the record with the Libyan Attorney General's April 15, 2026, certification. On April 30, 2026, counsel supplemented it again with the findings of the Big Four accounting firm's August 2025 due-diligence review of al-Masraf's loan book. Mr. Gadalla's Canadian counsel wrote separately on May 13, 2026.

152. Weeks after publication, on May 19, 2026, The Sentry responded through outside counsel. It refused to retract, refused to apologize, and announced that it "remains confident in the accuracy of its reporting."

153. Confronted with the official records of the Dubai corporate registry, the lending bank, the Central Bank of Libya, the national share registry, and the Attorney General's Office, The Sentry dismissed the documents en masse, asserting among other things that records from Libyan institutions were unworthy of credit because those institutions are situated in eastern Libya. The Sentry thus adopted a position under which no official record and no institutional certification could ever displace its anonymous sources. What's more is that The Sentry calls upon this same institution to act on the allegations contained in its Report, but then attempts to discredit the Office when it contradicts The Sentry's preconceived narrative.

154. As to the Attorney General's certification in particular, The Sentry asserted that the document came from a deputy prosecutor based in Benghazi rather than from the internationally recognized Attorney General. The document itself refutes that assertion. The certificate was issued on the letterhead of the Office of the Attorney General of Libya, bearing the national emblem of the State of Libya, the Office's reference number 7947-6-6, the Office's official seal, and the Office's own published contact details—including its address at the Courts Complex in *Tripoli* and its official website and e-mail address. The Office of the Attorney General of Libya has remained one of Libya's few unified national institutions notwithstanding the country's political division, and the Report itself treats "the Libyan Attorney General's Office" as a single national authority competent to prosecute the conduct it describes.

155. Both the Report and the Press Release remain published on TheSentry.org and continue to be distributed and cited. The Sentry has not corrected, qualified, retracted, or annotated

any of the statements at issue, notwithstanding its possession, for more than four months, of the official records demonstrating their falsity.

**L. Mr. Gadalla Is a Private Figure.**

156. Mr. Gadalla is a private figure for purposes of this action. He has achieved no general fame or notoriety in any community. In the places where The Sentry aimed its accusations and where the resulting harm has fallen most heavily—the United States, Canada, the United Kingdom, and the European Union—he is not a household name, and he has no regular or continuing access to media through which to counter defamatory falsehoods.

157. Nor is Mr. Gadalla a limited-purpose public figure. There was no preexisting public controversy in which he was a participant. He did not voluntarily inject himself into any controversy concerning the Libyan conflict, the governance of Libyan banks, sanctions policy, or arms proliferation, and he took no steps designed to influence the outcome of any such controversy. His conduct consists of operating trading and industrial companies, holding minority shares in publicly traded banks, and chairing manufacturing enterprises. That is private commercial activity. Conducting lawful business in a region beset by conflict does not make a businessman a public figure.

158. The Sentry cannot manufacture Mr. Gadalla's public-figure status by the act of defaming him. The reach that The Sentry gave its own accusations, through a press release distributed to journalists and engineered for republication, is a measure of The Sentry's conduct and of the harm it caused. It is not evidence that Mr. Gadalla was a participant in any public controversy before The Sentry named him.

159. Mr. Gadalla's efforts to defend himself after publication—retraction demands through counsel, corrective submissions to entities that republished the accusations, and other

efforts to mitigate the harm The Sentry caused—are defensive responses to The Sentry's attack. They do not retroactively transform him into a public figure.

### M. The Sentry Published with Negligence and, Independently, with Actual Malice.

#### 1. Negligence.

160. The Sentry failed to exercise even ordinary care. A reasonably prudent publisher making accusations of war financing, bank fraud, money laundering, counterfeiting, and arms trafficking against a named individual would, at a minimum: obtain the official ownership records of the companies it claims he controls; verify the currency of a ten-month-old database entry underlying its central ownership claim; ask the lending bank whether the loans it describes as unpaid exist and remain outstanding; ask the regulator whether the blacklist it describes was issued; ask the share registry who owns the banks; ask the prosecuting authority whether the investigation it describes exists; and put its specific accusations to the subject with a genuine opportunity to respond.

161. Further, a reasonably prudent publisher that learned, as The Sentry did, that its subject claimed never to have received its inquiry at all and stood ready to respond once given the accusations, would also have provided additional time to respond before publishing.

162. The Sentry did none of these things. Each was simple. Each would have revealed falsity before publication.

163. The Sentry knew that its methodology has historically produced accusations that it cannot substantiate. Indeed, by April 2026, The Sentry's reliance on unnamed sources and unverified inference had repeatedly drawn formal challenge.

164. Its February 2020 report titled *Loan Wolves* was the subject of a defamation action filed against TheSentryOrg Inc. in this District by a Sudanese businessman alleging the knowing

publication of false information, *Mahgoub v. TheSentryOrg, Inc.*, No. 1:22-cv-01989 (D.D.C.). After that lawsuit was filed, the *Loan Wolves* report was removed from The Sentry's website.

165. In 2023, The Sentry was sued twice for defamation in the Central African Republic over its June 2023 report *Architects of Terror*. In at least one of those actions The Sentry did not appear to defend the accuracy of its reporting or to substantiate the accusations it had published. The court proceeded in The Sentry's absence and entered a default judgment against it for defamation, awarding substantial damages.

166. In March 2023, the Government of South Sudan issued a 134-page response to The Sentry's December 2022 report *Undercover Activities: Inside the National Security Service's Profitable Playbook*. The response condemned the report as baseless and sharply criticized The Sentry's investigative methodology, including its overuse of anonymous sources, its reliance on second-hand hearsay and unverifiable media reports, and its self-referential reliance on The Sentry's own prior reports.

167. In August 2021, The Sentry published *Cultivating Atrocities*, which accused subsidiaries of the French Castel Group of complicity in war crimes and crimes against humanity and urged French authorities to investigate. When French prosecutors opened an investigation, The Sentry publicly represented that its findings rested on the "extensive evidence in its investigative report."[7] After nearly four years, France's National Anti-Terrorism Prosecutor closed the case without prosecution because the alleged offenses were "insuffisamment caractérisées"—insufficiently established. The Sentry did not announce that outcome.

---

[7] The Sentry, Press Release, Breaking: France Opens War Crimes Inquiry Focused on Iconic Food and Beverage Conglomerate (July 1, 2022) (quoting Nathalia Dukhan, Senior Investigator, The Sentry), https://thesentry.org/2022/07/01/7216/.

168. When the false story was about his own family, The Sentry's co-founder applied a very different standard. In July 2014, after a British tabloid published such a story, George Clooney condemned the "irresponsibility" of publishing it as "at the very least negligent and more appropriately dangerous."[8] Within two days, the tabloid removed the story and apologized.[9] Clooney rejected the apology: "There is one constant when a person or company is caught doing something wrong. The coverup is always worse."[10] The Sentry holds itself out as an investigative organization that provides "evidence and strategies for governments, banks, and law enforcement."[11] Yet it does not meet even the standard of a tabloid. It said nothing when French prosecutors closed the Castel investigation—nearly four years after The Sentry touted its "extensive evidence"—because the alleged offenses were insufficiently established. It removed Loan Wolves from its website only after it was sued. And it has refused to retract or apologize to Mr. Gadalla despite the official records refuting its accusations.

169. The Sentry therefore knew, before it published anything about Mr. Gadalla, that its practice of building grave accusations against named individuals on anonymous sources and inference had repeatedly produced claims that subjects, governments, and investigating authorities were able to show were unsupported. It applied that same methodology here.

**2. Actual Malice as to Both Publications.**

---

[8] George Clooney, *Exclusive: Clooney responds to "Daily Mail" Report*, USA Today (July 9, 2014), https://www.usatoday.com/story/life/people/2014/07/09/george-clooney-daily-mail-exclusive-statement-response/12368061/.

[9] Megan Gibson, *Daily Mail Takes Down George Clooney Article After Actor Blasts It*, Time (July 9, 2014), https://time.com/2969159/george-clooney-daily-mail-usa-today-op-ed/ (quoting the Daily Mail's statement that "[w]e have removed the article from our website").

[10] William Turvill, *'They've Exposed Themselves as the Worst Kind of Tabloid': George Clooney Rejects Mail Apology*, Press Gazette (July 11, 2014), https://pressgazette.co.uk/publishers/nationals/theyve-exposed-themselves-worst-kind-tabloid-george-clooney-rejects-mail-apology/ (quoting Clooney's July 11, 2014 statement to USA Today).

[11] The Sentry, About The Sentry, https://thesentry.org/about/ (last visited Oct. 6, 2026).

170. Although Mr. Gadalla, as a private figure, need prove only negligence, The Sentry's conduct independently satisfies the actual-malice standard. The Sentry published with knowledge of falsity or with reckless disregard for whether its statements were false. The following allegations, individually and cumulatively, support that conclusion:

171. *Purposeful avoidance of the truth.* As set forth in ¶¶ 127–133, The Sentry claimed sourcing close to the Libyan Attorney General's Office, asserted as fact that an investigation was pending, and publicly called upon that Office to prosecute Mr. Gadalla, while never putting a single question to it. When the Office was asked, it certified that the predicates The Sentry described do not exist as to Mr. Gadalla. On information and belief, The Sentry avoided that Office, as it avoided al-Masraf, the Central Bank of Libya, the Libyan Stock Market, and Lloyd's List Intelligence, because it entertained serious doubts about its accusations and did not want them resolved. More than a mere failure to investigate, The Sentry's refusal to engage was a deliberate decision not to know the truth and to maintain a position of willful blindness to the accusations it was making.

172. *Reliance on a withdrawn database entry it chose not to re-check.* The Sentry rested its central ownership claim on a Lloyd's List Intelligence entry it had last reviewed ten months before publication. The publisher of that database formally removed the entry before the Report appeared. For an accusation of this gravity, resting on a single stale source and declining to re-verify it was reckless disregard for the truth. The Sentry's own endnote 325 shows that it also possessed the Dubai registry documentation that identifies UDS Shipping's actual sole owner.

173. *Contradiction within the Report itself.* The Report asserts that an Attorney General investigation implicating Mr. Gadalla's companies is pending; concedes in its own text that the actual inquiry "seems to focus on former LFB general manager Jamal"; and then recommends that

a case involving Mr. Gadalla be referred to that Office for prosecution. Those three statements cannot all be true, and The Sentry published all three.

174. *Publication despite notice that its target was seeking to respond.* As set forth in ¶¶ 141–149, on information and belief The Sentry learned through The Globe and Mail, days before publication, that Mr. Gadalla had never received its allegations and was asking for the Report so that he could answer them. The Sentry did not provide the Report, renew its outreach, or delay publication by a single day. That, too, was purposeful avoidance of the truth.

175. *A predetermined narrative that no evidence could disturb.* The Sentry's response to the proof confirms that it had settled on its conclusions before it published. When Mr. Gadalla supplied the certification of the very Office whose authority the Report had invoked, The Sentry did not engage with it. Instead, The Sentry disqualified it on a ground the document itself refutes, and dismissed the certifications of the lending bank, the central bank, the national share registry, and the Dubai corporate registry as unworthy of credit. The Sentry had resolved, before it published, that no official record would be permitted to displace its anonymous sources.

**3. Additional Actual Malice as to the Press Release.**

176. The Press Release supplies a further and independent basis for the conclusion that The Sentry knew its accusations were false when it published them.

177. *The Sentry removed its own qualifications.* As set forth in ¶¶ 71–78, The Sentry qualified accusations in the Report and then asserted those same accusations as unqualified fact in the Press Release. While its efforts at hedging in the Report were not sufficient to remove the false and defamatory nature of the Report's allegations, the removal of those qualifications from the Press Release reflects on The Sentry's actual malice. A publisher that writes "likely" in the document it expects few people will read, and then deletes it from the document prepared for journalists and governments, has demonstrated that it knew the underlying claim was not

established. The Report's qualifications are The Sentry's own contemporaneous assessment of the strength of its proof. Their removal was deliberate and it was directed at the audience The Sentry wanted to move.

178. *The Sentry removed its own source attributions.* As set forth in ¶¶ 77–78, The Sentry attributed its most serious accusations in the Report to unnamed persons it said it had interviewed, and then published those same accusations in the Press Release as findings of its own investigation, with no attribution at all. The Sentry knew the difference between what its sources had told it and what it had verified. It also knew that revealing that its sources were anonymous in the Press Release could impact whether readers accepted the allegations as established fact. The Sentry deprived readers of the Press Release of attribution to anonymous sources for that very reason—because The Sentry wanted readers to accept its "findings" as fact.

**N. The Publications Have Caused Severe and Continuing Harm.**

179. The Report and the Press Release were engineered to have serious consequences. Their express purpose is to cause the United States, Canada, the United Kingdom, and the European Union to impose sanctions on Mr. Gadalla and his companies, measures that would freeze assets, sever banking relationships, and destroy enterprises on which thousands of employees depend.

180. In sum, The Sentry demanded that Mr. Gadalla be designated, de-banked, cut off from commerce in the jurisdiction where his companies are headquartered, investigated by three governments, and prosecuted.

181. Because The Sentry's reports are built to trigger sanctions, asset freezes, prosecutions, and de-banking, The Sentry knows and intends that its factual assertions will be treated as reliable factual information by governments, banks, compliance departments, and

journalists, and that they will surface in know-your-customer and anti-money-laundering screening for years.

182. They reached the audiences that matter most to a businessman: banks, compliance departments, counterparties, regulators, and journalists. Their accusations were republished, quoted, and amplified across borders, including in the Italian press, the French press, the British press, and in Canada, where Mr. Gadalla lives, and were repeated to his business partners and to institutions with which his companies deal.

183. That republication was the foreseeable and intended consequence of The Sentry's conduct.

184. Financial institutions and prospective business partners treat a published sanctions-advocacy report naming an individual as a de-risking trigger in know-your-customer and anti-money-laundering screening. The effect is not a matter of opinion or degree: the name is flagged, the relationship is reviewed, and the transaction often does not proceed.

185. A significant personal and business real estate transaction Mr. Gadalla had initiated in the United Kingdom was terminated by the counterparty expressly because of The Sentry's accusations and their republication in the European press.

186. Mr. Gadalla and his companies have been questioned about the accusations by financial institutions and business partners, and transactions have been delayed, restricted, or cancelled as a result. By way of example, Mr. Gadalla has recently been de-banked by one institution as a result of The Sentry's publications. As another example of the impact on Mr. Gadalla's reputation, some of his businesses have faced supply challenges because vendors have expressed concern regarding The Sentry publications.

187. On information and belief, other banks, business partners, and prospective business partners have altered or avoided relationships with Mr. Gadalla and his companies as a direct result of the publications.

188. As a direct and proximate result of the Report and the Press Release, Mr. Gadalla has suffered and continues to suffer reputational injury, lost business opportunities and commercial relationships, impairment of his companies' operations and banking access, expenses incurred to correct the record and repair his reputation, mental anguish, and humiliation.

## FIRST CLAIM FOR RELIEF

### (Defamation – The Press Release)

189. Mr. Gadalla repeats and realleges paragraphs 1 through 188 as if fully set forth herein.

190. The Press Release is a publication separate and independent from the Report. The Sentry wrote it, gave it its own headline, its own text, its own dateline, and its own on-the-record quotations, published it at its own address on its website, and distributed it to journalists through its Director of Communications. It was read, republished, and relied on as a standalone document.

191. The Sentry published the Press Release to third parties worldwide, from the District of Columbia, on April 7, 2026, and it remains published today.

192. The Press Release contains false statements of fact of and concerning Mr. Gadalla. Unlike the Report, it contains no endnotes, no citations, no source attributions, and no qualifications. Every assertion in it is stated flatly, in The Sentry's own voice, as the established findings of an investigation. Those false statements include the following:

(a) that Mr. Gadalla is "the linchpin of the Haftar family's power—controlling banks, evading the UN arms embargo, distributing unauthorized dinar banknotes, and

orchestrating multimillion-dollar fraud schemes to bankroll Field Marshal Haftar's power ambitions at the expense of the Libyan public";

(b) that Mr. Gadalla "used utilized [sic] Emirati companies to borrow $300 million from Abu Dhabi's al-Masraf bank, backed by a guarantee deposit from the Libyan Foreign Bank—public money from Tripoli—to help finance Haftar's April 2019 offensive on Tripoli";

(c) that the offensive was one "which involved payments to Russian combatants from the Wagner Group";

(d) that "the loans were never fully repaid, leaving the Libyan public holding the bill for an attack on their own capital";

(e) that Mr. Gadalla "exerts de facto control over three major Libyan banks, using them to commit fraudulent schemes and launder ill-gotten profits";

(f) that Mr. Gadalla "has overseen the printing of billions in unauthorized 50-dinar banknotes in Russia, a scheme so damaging that the Central Bank of Libya (CBL) was forced to retire all 50-dinar banknotes in April 2025";

(g) that Mr. Gadalla "serves as the Haftar family's go-to architect for importing weapons in apparent violation of the UN arms embargo";

(h) that "The Sentry's findings tie Gadalla to three high-profile arms smuggling episodes since 2023," and that "[i]n each case, Gadalla played a role in arranging the logistics, the financing, or both";

(i) that the Aya 1 is "a container ship controlled by Gadalla," carrying "ammunition and some 200 military vehicles from the UAE to Benghazi—cargo ultimately

intended for the Rapid Support Forces, a leading combatant in Sudan's brutal civil war";

(j) that Mr. Gadalla is "the most versatile financial architect serving Field Marshal Khalifa Haftar and his sons," "perhaps the most emblematic illicit actor in Libya today, enabling powerful state figures to loot the nation's wealth," operating "under the armed protection of Haftar's son, Saddam Haftar";

(k) the statement attributed to Justyna Gudzowska that Mr. Gadalla "helps the Haftar family turn military force into cash and cash into weapons," that "[h]e helped bankroll a devastating assault on Tripoli with Libyan public funds, participated in flooding the economy with unauthorized dinar banknotes, and orchestrated arms shipments that appear to defy international law—all without facing a single consequence"; and

(l) the statement attributed to Oliver Windridge that Mr. Gadalla "represents an entire class of enablers who do the dirty work for Libya's warlords—laundering money, smuggling arms, subverting local banks—while hiding behind political protection and armed cover."

193. Each of the statements identified in the preceding paragraph is false, both in its particulars and in the overall message it conveys, as set forth in ¶¶ 98–126.

194. The statements identified above are assertions of verifiable fact. An ordinary reader would understand each statement as an assertion that Mr. Gadalla in fact committed the acts described.

195. Each of the statements is defamatory per se:

(a) Subparagraphs (a) through (d) accuse Mr. Gadalla of obtaining $300 million by fraud, of diverting Libyan public funds, of financing an armed assault on his own country's capital, and of financing a mercenary organization subject to international sanctions. Those are accusations of serious criminal conduct.

(b) Subparagraph (e) accuses Mr. Gadalla of covertly controlling three regulated banks and of using them "to commit fraudulent schemes and launder ill-gotten profits." Those are accusations of bank fraud and money laundering.

(c) Subparagraph (f) accuses Mr. Gadalla of overseeing the printing of unauthorized currency. That is an accusation of counterfeiting.

(d) Subparagraphs (g) through (i) accuse Mr. Gadalla of trafficking in weapons, ammunition, and military equipment in violation of a United Nations arms embargo, and of arming a combatant in the war in Sudan. Those are accusations of criminal conduct under the laws of multiple nations.

(e) Subparagraphs (j) accuses Mr. Gadalla of being an instrument of a warlord family and of holding assets and offices as the fruits of that role. Standing alone and together with the foregoing, those accusations injure him in his trade, profession, and business.

(f) Subparagraphs (k) and (l) accuse Mr. Gadalla of bankrolling a "devastating assault" with public funds, of "flooding the economy with unauthorized dinar banknotes," of orchestrating unlawful arms shipments, and of "laundering money, smuggling arms, [and] subverting local banks." Those are accusations of criminal conduct.

(g) Each of the foregoing, individually and cumulatively, injures Mr. Gadalla in his trade, profession, and business, and is disqualifying in the know-your-customer and

anti-money-laundering screening on which his companies' banking and commercial relationships depend.

196. The Sentry published the Press Release without privilege.

197. Mr. Gadalla is a private figure, and negligence therefore suffices. The Sentry was negligent as set forth more fully in ¶¶ 156–169.

198. In addition, and in the alternative, The Sentry published the Press Release with actual malice—that is, with knowledge that its statements were false or with reckless disregard for whether they were false—as set forth more fully in ¶¶ 170–178. The Sentry's decisions to remove from the Press Release the qualifications and source attributions that appear in the Report, and to enlarge its accusations beyond anything any source had given it, are independent evidence that The Sentry knew those accusations were false.

199. The Sentry intended and foresaw that the Press Release would be republished in whole and in part by news organizations, aggregators, and screening and compliance databases, and it was.

200. As a direct and proximate result of The Sentry's publication of the Press Release, Mr. Gadalla has suffered reputational, professional, financial, and emotional harm as set forth above, entitling him to special damages, other compensatory damages, presumed damages, and punitive damages.

## <u>SECOND CLAIM FOR RELIEF</u>

### (Defamation by Implication — The Press Release)

201. Mr. Gadalla repeats and realleges paragraphs 1 through 200 as if fully set forth herein.

202. Beyond the express false statements identified in the First Claim for Relief, the Press Release conveys a separate and independently defamatory meaning by juxtaposition and implication.

203. Immediately after reciting its accusations that Mr. Gadalla financed Field Marshal Haftar's assault on Tripoli, exerted covert control over three banks to commit fraud and launder ill-gotten profits, oversaw the printing of counterfeit currency, and trafficked arms in violation of a United Nations embargo, the Press Release states, under the same "Key Report Insights" heading and without transition: "Meanwhile, Gadalla lives lavishly. He carries a St. Kitts passport, flies on a private jet, and owns a $3.7 million condominium in one of Toronto's most exclusive neighborhoods. He maintains permanent residency in Canada." It continues: "That an obscure Libyan fixer—not a warlord or a politician—has managed to accumulate such vast wealth and responsibilities, is itself a measure of how deeply the system is broken."

204. In that position, in that context, and juxtaposed against the accusations that immediately precede it, that passage conveys a defamatory meaning distinct from those accusations themselves: that Mr. Gadalla's home, his aircraft, and his wealth are the proceeds of the criminal schemes the Press Release has just described. The Sentry intended readers to understand the implication in that manner and ordinary readers understood it in that way.

205. That implication is false. Mr. Gadalla's assets are the product of more than two decades of lawful trading, logistics, and industrial enterprise, documented in official corporate registries and financed through banking relationships that the banks themselves have certified were lawful.

206. The implication is defamatory per se. It accuses Mr. Gadalla of personally profiting from war financing, bank fraud, money laundering, counterfeiting, and arms trafficking, and of

concealing the proceeds of those crimes in his lifestyle and residence. It injures him in his trade, profession, and business, and it is disqualifying in the know-your-customer and anti-money-laundering screening on which his companies' banking and commercial relationships depend.

207. The Sentry published the Press Release, and the implication it conveys, without privilege.

208. Mr. Gadalla is a private figure, and negligence therefore suffices. The Sentry was negligent as set forth more fully in ¶¶ 156–169.

209. In addition, and in the alternative, The Sentry conveyed the implication with actual malice—that is, with knowledge that it was false or with reckless disregard for whether it was false. The Sentry placed the "Gadalla lives lavishly" passage immediately after and under the same heading as its recitation of the criminal schemes it accused Mr. Gadalla of financing, a juxtaposition The Sentry chose and controlled. That choice, together with the actual malice set forth in ¶¶ 170–178, demonstrates that The Sentry intended the implication and knew, or recklessly disregarded, that it was false.

210. The Sentry intended and foresaw that the Press Release, and the implication it conveys, would be republished in whole and in part by news organizations, aggregators, and screening and compliance databases, and it was.

211. As a direct and proximate result of The Sentry's publication of this implication, Mr. Gadalla has suffered reputational, professional, financial, and emotional harm as set forth above, entitling him to special damages, other compensatory damages, presumed damages, and punitive damages.

## THIRD CLAIM FOR RELIEF

**(Defamation — The Report)**

212. Mr. Gadalla repeats and realleges paragraphs 1 through 211 as if fully set forth herein.

213. The Sentry published the Report to third parties worldwide, from the District of Columbia, on or about April 6, 2026, and it remains published today.

214. The Report contains false statements of fact of and concerning Mr. Gadalla:

(a) that "[p]rior to the April 2019 assault, Gadalla utilized a set of companies based in the United Arab Emirates (UAE) to secure $300 million in loans from" al-Masraf bank;

(b) that those funds "were funneled by Gadalla's companies into the war effort, likely including payments to Russia's Wagner Group," and that the funds "most likely bankrolled Wagner mercenaries' deployment";

(c) that "the loans have remained largely unpaid, leaving the Libyan public to bear the financial burden while Gadalla has faced no accountability";

(d) that Mr. Gadalla "has wielded control over the Bank of Commerce and Development (BCD) and other financial institutions in eastern Libya, such as Wahda Bank and National Commercial Bank," that he "rose to become BCD's de facto chief," and that he "took control of the BCD for the Haftar family";

(e) that Mr. Gadalla used those institutions "to facilitate large-scale letter-of-credit fraud and to launder illicit profits";

(f) that Mr. Gadalla "is also involved in the circulation of counterfeit Russian-printed dinars" and "was the main person overseeing the distribution of these counterfeit dinars";

(g) that "Gadalla's three Dubai-based entities later appeared on a blacklist issued by the CBL owing to suspected letter-of-credit fraud, with an investigation by the Libyan attorney general pending";

(h) that UDS Shipping Services LLC is "a Dubai maritime company under [Mr. Gadalla's] control" and that the Aya 1 is "the Alushibe Group's" ship, which "lifted 350 containers filled with ammunition and about 200 large military-use vehicles from the UAE and headed for Benghazi," "ultimately intended for the RSF in Sudan";

(i) that Mr. Gadalla "has served as a key enabler for the Haftar family's transnational arms smuggling in apparent violation of the United Nations (UN) arms embargo on Libya" and "helped orchestrate several recent high-profile schemes, playing an active role in arranging the intricate payment structures and logistical routes necessary to illicitly transfer military equipment to Benghazi";

(j) that "Yusef al-Ubeidi, the Madrid-based individual suspected of having helped coordinate the arms purchase, told investigators that Gadalla, acting for Saddam Haftar, was involved," and that "one of Gadalla's Dubai firms played a role in the scheme, which included wiring 14 million euros to the Spanish firms";

(k) that Mr. Gadalla "helped orchestrate" the Haftars' attempted 2024 importation of Chinese FL-1 combat drones disguised as wind turbines; and

(l) that Mr. Gadalla is "a key enabler of the Haftar family's kleptocratic activities" and one of the "'enablers' who take advantage of institutional weakness and armed protection to help powerful figures loot state wealth."

215. Each of those statements is false, both in its particulars and in the overall message it conveys, as set forth in ¶¶ 98–126.

216. The statements identified above are assertions of verifiable fact. The Report presents them as the product of a multi-year investigation and purports to support them with 400 endnotes, which signals to the reader that they rest on a documented factual record. They do not, as set forth in ¶¶ 95–97.

217. Each of the statements is defamatory per se:

(a) Subparagraphs (a) through (c) accuse Mr. Gadalla of obtaining $300 million by fraud, of diverting Libyan public funds, of financing an armed assault on his own country's capital, and of financing a mercenary organization subject to international sanctions. Those are accusations of criminal conduct.

(b) Subparagraph (d) accuses Mr. Gadalla of unlawfully seizing and exercising covert control over regulated financial institutions on behalf of an armed faction. That is an accusation of criminal conduct and of professional misconduct disqualifying him from the banking and commercial relationships on which his businesses depend.

(c) Subparagraph (e) accuses Mr. Gadalla of large-scale letter-of-credit fraud and of money laundering. Both are crimes, and both are precisely the conduct that causes banks and counterparties to terminate relationships.

(d) Subparagraph (f) accuses Mr. Gadalla of overseeing the distribution of counterfeit currency. Currency counterfeiting and its distribution are crimes.

(e) Subparagraph (g) accuses Mr. Gadalla of having been blacklisted by his country's central bank for suspected fraud and of being the subject of a pending criminal investigation by his country's prosecuting authority. An accusation that a person

is under criminal investigation for fraud is defamatory per se and is independently disqualifying in know-your-customer and anti-money-laundering screening.

(f) Subparagraphs (h) through (k) accuse Mr. Gadalla of trafficking in weapons, ammunition, and military equipment in violation of a United Nations arms embargo, of arming a combatant in the war in Sudan, and of orchestrating the payment structures and shipping routes to accomplish it. Those are accusations of criminal conduct under the laws of multiple nations.

(g) Subparagraph (l) accuses Mr. Gadalla of being a career enabler of kleptocracy who loots state wealth. Standing alone and in combination with the foregoing, that accusation injures him in his trade, profession, and business as a businessman whose livelihood depends entirely on his ability to bank, to contract, and to be trusted by sophisticated counterparties.

218. The Sentry published the Report without privilege.

219. Mr. Gadalla is a private figure, and negligence therefore suffices. The Sentry was negligent as set forth more fully in ¶¶ 156–169.

220. In addition, and in the alternative, The Sentry published the Report with actual malice—that is, with knowledge that its statements were false or with reckless disregard for whether they were false—as set forth more fully in ¶¶ 170–178.

221. As a direct and proximate result of The Sentry's publication of the Report, Mr. Gadalla has suffered reputational, professional, financial, and emotional harm as set forth above, entitling him to special damages, other compensatory damages, presumed damages, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ahmed Abrahem Ahmed Gadalla respectfully requests that the Court enter judgment in his favor and against Defendant TheSentryOrg Inc. d/b/a The Sentry as follows:

(a) Awarding Mr. Gadalla compensatory damages, including presumed damages, in an amount to be determined at trial;

(b) Awarding Mr. Gadalla punitive damages in an amount to be determined at trial;

(c) Awarding Mr. Gadalla pre-judgment and post-judgment interest as permitted by law;

(d) Awarding Mr. Gadalla his costs of suit; and

(e) Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Mr. Gadalla demands a trial by jury on all issues so triable.

Date: October 19, 2026

*/s/ Mitchell J. Langberg*

Mitchell J. Langberg (District Bar ID NV008)
Thomas A. Clare, P.C. (D.C. Bar No. 461964)
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
mitch@clarelocke.com
tom@clarelocke.com

*Counsel for Plaintiff Ahmed Abrahem Ahmed Gadalla*